# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 30, 2008

Charles R. Fulbruge III
Clerk

No. 06-31311

RODNEY C TUREAUD, JR

Plaintiff-Appellee

v.

GRAMBLING STATE UNIVERSITY, through the Board of Supervisors
of the University of Louisiana System

Defendant-Appellant

-------------------------------------------------------------------------------------------------------------

Consolidated with
No. 07-30436

RODNEY C TUREAUD, JR

Plaintiff-Appellant

v.

GRAMBLING STATE UNIVERSITY, through the Board of Supervisors
of the University of Louisiana System

Defendant-Appellee

Appeals from the United States District Court
for the Western District of Louisiana
(3:03-CV-2253)

Before DAVIS, SMITH, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

Plaintiff Rodney Tureaud filed a retaliatory discharge claim against his former employer, Grambling State University (Grambling), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. He brought additional claims under Louisiana state law, including intentional infliction of emotional distress and improper denial of payments for accrued leave in violation of LA. REV. STAT. § 23:632. Grambling is a historically black university located in Louisiana. Tureaud, who is black, alleged that he was terminated from his position as Police Chief of Grambling because of his attempts to hire Wesley Harris, who is white, as Assistant Police Chief.

On June 24, 2005, Grambling filed a motion for summary judgment, alleging that Tureaud's claims failed as a matter of law. The district court granted Grambling's motion for summary judgment as to the state law claims but denied the motion as to the retaliatory discharge claim under Title VII, which was tried before a jury in October of 2006. The jury returned a unanimous verdict in favor of Tureaud, awarding him $140,000 for compensatory damages, $187,000 for past loss of income, $27,500 for future loss of income, and deducted $132,000 for failure to mitigate for a total amount of recovery of $225,000. Grambling then moved for a judgment notwithstanding the verdict, or alternatively for remittitur, which the district court denied. Tureaud filed a motion for award of attorney's fees, which the district court also denied. Grambling's appeal of the denial of the motion for judgment notwithstanding the verdict or remittitur has been consolidated with Tureaud's cross-appeal of the denial of his motion for award of attorney's fees.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On appeal, Grambling argues that (1) there was not a legally sufficient evidentiary basis for the jury to conclude that Tureaud engaged in protected activity because he did not satisfy the "opposition requirement" of a Title VII retaliation claim; (2) there was not a legally sufficient evidentiary basis for the jury to conclude that Tureaud suffered a retaliatory discharge because he admitted that he did not follow the correct procedures for hiring Harris; and (3) even assuming the jury verdict is supported by the evidence, Tureaud's testimony is insufficient to support the jury's award of $140,000 in compensatory damages. On cross-appeal, Tureaud argues that the district court abused its discretion in denying him attorney's fees because a prevailing party in a Title VII case is ordinarily entitled to an award of reasonable attorney's fees in all but special circumstances.

We find that there is a legally sufficient evidentiary basis for the jury to conclude that Tureaud engaged in protected activity by opposing an unlawful employment practice. A rational jury could have found that Grambling's legitimate, non-discriminatory reasons for discharging Tureaud were pretextual. After reviewing the record, we refuse to disturb the jury's award of $140,000 in compensatory damages. Because Tureaud was the prevailing party and the district court did not identify any special circumstances justifying the denial of attorney's fees, we find that the district court abused its discretion in refusing to award reasonable attorney's fees and costs. Thus, we affirm the judgment in favor of Tureaud, but we vacate the district court's order denying attorney's fees and remand with instructions to award reasonable attorney's fees and costs to Tureaud.

## I. Factual and Procedural Background

Tureaud, a black alumnus of Grambling, was hired as Police Chief in October of 2002. Prior to working at Grambling, he worked in federal law enforcement for more than twenty years. His last job was Special Agent in

charge of U.S. Customs Service Office of Investigation in Seattle, Washington. His responsibilities as Police Chief included managing the office, training the officers, engaging in law enforcement, and overseeing the interactions of the police department with the university and community. Although Tureaud's management duties allowed him to recruit employees for the police department and make recommendations, he did not have the authority to make the ultimate hiring decisions.

Grambling categorizes employees as either classified or unclassified. Classified employees are members of the Louisiana Civil Service System, subject to the system's rules governing employment, including hiring, firing, compensation and benefits. Unclassified employees are not part of the civil service and are generally at-will employees subject to the rules contained in Grambling's Unclassified Employee Handbook (Handbook). The position of Police Chief is unclassified, whereas the lieutenants, sergeants, and police officers are classified employees. Tureaud received a copy of the Handbook and the Civil Service rules when he was hired.

Tureaud saw the need for a new position, Assistant Police Chief, and received approval to create the unclassified position. He began the process of recruiting and recommending an individual to fill this position as well as two existing classified sergeant positions. Tureaud apparently attempted to fill the unclassified Assistant Police Chief position in accordance with the Civil Service rules, not knowing that he was supposed to follow the Handbook rules. According to Tureaud, he followed the hiring procedures as explained to him. He sought and obtained authorization to initiate the process to hire an Assistant Police Chief and advertised for the position in accordance with the rules. Four applications were submitted. Two of the applicants, both black males, were deemed a better fit for the sergeant position. One applicant was rejected entirely on the basis that he had previously worked for Grambling and left. The third

applicant, Wesley Harris, was selected by Tureaud for the Assistant Police Chief position. The Handbook requires a search committee be formed, but a search committee was not involved until it was time to interview Tureaud's chosen candidate. This panel included an employee of the Lincoln Parish Sheriff's Office, the Chief of Police at University of Louisiana at Monroe, and a United States Marshal from Monroe. Dr. Ruby Higgins, Tureaud's direct supervisor, also in charge of ensuring that the hiring procedures are followed for unclassified employees, objected to the size and composition of the "search committee," although the Handbook did not provide any rules governing size or composition. According to Tureaud, he was not told that he had failed to follow proper hiring procedures.

Tureaud made his recommendation to Higgins to hire Harris and the two black sergeants. Tureaud submitted the requisite personnel action form (PAF) on behalf of all three candidates. Higgins explained that Harris's PAF could not be processed because it had been signed by Harris, and an applicant is not permitted to sign the form before the other required signatures were on the form. Tureaud was unaware of this rule.[1] His only experience with Grambling's PAF was when he completed his own PAF. He was the first person to sign his PAF. Tureaud submitted Harris's PAF a second time, completed without the signature. In response, on March 31, 2003, Higgins sent Tureaud a memo stating: "You have failed to follow procedure and I will not approve this form."

On May 13, 2003, Tureaud inquired in writing to Higgins regarding the status of PAFs. On May 15, 2003, Higgins agreed in writing to process the paperwork for the classified sergeant positions but stated that she would not process Harris's PAF. According to Higgins, her refusal to process Harris's

---

[1] When asked whether a job applicant can sign the PAF before other Grambling officials sign it, Cheryl Ivory, an employee of Grambling's Human Resources Department, testified as follows: "[I]t happens sometimes, and it usually is not a problem. It's really no set thing, especially at that time, whether they sign before or after."

5

paperwork was due to the fact that no information had been forwarded from the search committee. On May 18 or 19, 2003, Higgins recommended to the President of Grambling, Dr. Neari Warner, that Tureaud's employment be terminated. On May 20, 2003, Tureaud was notified that his employment with Grambling was to be terminated effective June 3, 2003. He was placed on mandatory compensatory leave effective May 21 through June 3, 2003.

Tureaud believed that Higgins would not process Harris's application because Harris was white. Prior to submitting Harris's second PAF, Tureaud sought assistance from various people around campus to rally support for Harris. According to Tureaud, this was his way of opposing the unlawful employment practice of not processing Harris's application because of his race. Tureaud spoke with Dr. Angela Weaver, the Executive Assistant to the President of Grambling, who reviewed Harris's resume and expressed her disapproval that Harris had been employed by the Ruston Police Department, which she perceived as "racist." Weaver recommended hiring a black man and training him instead of hiring Harris. Other individuals consulted included the President of Grambling, the Vice President of Finance of Grambling, a former assistant coach and member of the Grambling Alumni Association, a State Representative, the son of a State Representative, and a Lincoln Parish District Attorney. According to Tureaud, he was told by persons within the university community and the community at large that he would never be allowed to hire a white Assistant Police Chief for Grambling. The District Attorney and the State Representative told Tureaud that "they would communicate with the Louisiana State Board." The son of the State Representative told Tureaud that "he had experienced the same problems" with Grambling.

Tureaud believes this action of opposing the unlawful hiring practice is the reason he was terminated. Grambling contends otherwise, providing several specific incidents supporting Tureaud's discharge. Grambling alleges that

Tureaud did not follow proper procedures to fill any police department position during Spring of 2003. The Human Resources Department, which is responsible for overseeing the hiring process of classified employees, determined that Tureaud had incorrectly followed the Civil Service rules for the hiring of the sergeant positions. At the time of the trial in district court, the one position for Assistant Police Chief and the two positions for sergeant remained unfilled. Also, Higgins spoke to Tureaud about how his arrest of a student was perceived negatively by the student body; it became the subject of an editorial in the student newspaper. On February 20, 2003, the President of Grambling sent a letter to Tureaud, advising him to refrain from speaking for the university unless authorized, after Tureaud had made an inappropriate comment to the news media. On February 21, 2003, the President received a letter from a Grambling employee expressing concern about Tureaud's rude conduct at an interdepartmental meeting. Tureaud conceded that he "may have cursed" during that meeting, but only to emphasize that he was cracking down on employees stealing from the university. Grambling received an additional complaint from a local doctor who claimed Tureaud made inappropriate comments about an employee on worker's compensation leave. A female employee alleged physical harassment after Tureaud poked her with a rubber antenna. And finally, Grambling felt that Tureaud practiced poor judgment in preparing to arrest a student during the graduation ceremonies held in May of 2003. The President had to issue Tureaud an order over the police band radio not to arrest the student.

## II. Analysis

A.     Motion for Judgment as a Matter of Law

     1.     Standard of Review

"A motion for judgment as a matter of law (previously, motion for directed verdict or J.N.O.V.) in an action tried by jury is a challenge to the legal

7

sufficiency of the evidence supporting the jury's verdict." Allstate Ins. Co. v. Receivable Fin. Co., L.L.C., 501 F.3d 398, 405 (5th Cir. 2007) (citing Hiltgen v. Sumrall, 47 F.3d 695, 699 (5th Cir. 1995)); see also Smith v. Louisville Ladder Co., 237 F.3d 515, 525 n.2 (5th Cir. 2001) (noting that a motion for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law in accordance with FED. R. CIV. P. 50). The district court's denial of such a motion is reviewed de novo. Pineda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir. 2004). A motion for judgment as a matter of law should be granted if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). The court should grant a post-judgment motion for judgment as a matter of law only when "the facts and inferences point so strongly in favor of the movant that a rational jury could not reach a contrary verdict." Pineda, 360 F.3d at 486 (citing Thomas v. Texas Dep't of Criminal Justice, 220 F.3d 389, 392 (5th Cir. 2000)). "[W]hen evaluating the sufficiency of the evidence, we view all evidence and draw all reasonable inferences in the light most favorable to the verdict." Id.

### 2. Opposition Requirement

Grambling argues that Tureaud's retaliatory discharge claim fails as a matter of law because he did not engage in protected activity. "To establish a Title VII retaliation case, [Tureaud] was required to prove that he engaged in protected activity; he suffered from an adverse employment action; and there was a causal connection between the activity and the adverse employment decision." Adams v. Groesbeck Indep. Sch. Dist., 475 F.3d 688, 690-91 (5th Cir.), cert. denied, 128 S. Ct. 109 (2007). "Post-trial, the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), framework becomes moot, and the question is whether legally sufficient evidence supported the jury's finding in [Tureaud's] favor." Id. at 691. "An employee has engaged in activity protected by Title VII

if he has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." Long v. Eastfield Coll., 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)); see also Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1135 (5th Cir. Unit A Sept. 1981) (noting distinction between opposition clause and participation clause). It is an unlawful employment practice for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1); see also Banks v. E. Baton Rouge Parish Sch. Bd., 320 F.3d 570, 575 n.5 (5th Cir. 2003) (discussing this unlawful employment practice in the context of a Title VII retaliation claim).

Tureaud argues that he opposed Grambling's refusal to hire Harris as Assistant Police Chief because he was white. The opposition clause, not the participation clause, is relevant to this case. See Payne, 654 F.2d at 1135. "To satisfy th[e] opposition requirement, [Tureaud] need only show that []he had a reasonable belief that the employer was engaged in unlawful employment practices." Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 348 (5th Cir. 2007) (internal quotations omitted). The district court properly instructed the jury regarding the reasonable belief standard, and the jury unanimously concluded that Tureaud had a reasonable belief that Grambling discriminated against Harris because of his race. Grambling does not contest the jury's finding in this regard. Rather, Grambling argues that Tureaud did not engage in protected activity because he did not "oppose" any unlawful employment practice.

Tureaud does not argue that he opposed an unlawful employment practice directed against him. Instead, Tureaud claims that he opposed an unlawful employment practice direct against Harris, a job applicant. We have previously stated that "employee opposition to discriminatory employment practices

9

directed against a fellow employee may constitute activity protected under § 704(a) [the anti-retaliation provision of Title VII]." Jones v. Flagship Int'l, 793 F.2d 714, 727 (5th Cir. 1986); see also Holt v. JTM Indus., Inc., 89 F.3d 1224, 1226 (5th Cir. 1996) (acknowledging same principle in the context of an ADEA retaliation claim). For purposes of a Title VII retaliation claim, we can discern no appreciable difference between employee opposition to discriminatory employment practices directed against a fellow employee and those directed against a job applicant. The plain language of Title VII states that it shall be an unlawful employment practice for an employer to fail or refuse to hire "any individual" because of such individual's race. See 42 U.S.C. § 2000e-2(a)(1). The term "any individual" easily encompasses job applicants and prospective employees. Thus, Tureaud's opposition to Grambling's refusal to hire Harris because of his race may constitute protected activity under Title VII.

To establish a "causal link" because the protected activity and the adverse employment decision, the evidence must demonstrate that the decision maker had knowledge of the protected activity. See Watts v. Kroger Co., 170 F.3d 505, 512 (5th Cir. 1999). Tureaud was not required to submit a formal charge of discrimination to the EEOC or a formal complaint to the EEO office of Grambling before being discharged in order to satisfy the opposition requirement. An informal complaint to a supervisor regarding an unlawful employment practice may satisfy the opposition requirement of a Title VII retaliation claim.[2] See Jeffries v. Harris County Cmty. Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980); see also Hertz v. Luzenac Am., Inc., 370 F.3d 1014,

---

[2] Other circuits have broadly construed the scope of the opposition clause. See, e.g., Johnson v. Univ. of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000); Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990). We need not decide the outer limit of protected activity under the opposition clause in order to resolve this case.

1015 (10th Cir. 2004) (same); Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 n. 2 (11th Cir. 2002) (same).

Based on the facts of this case, we conclude that there is a legally sufficient evidentiary basis for a reasonable jury to find that Tureaud satisfied the opposition requirement of his Title VII retaliation claim. See FED. R. CIV. P. 50(a)(1); see also Robinson v. Se. Pa. Transp. Auth., 982 F.2d 892, 896 (3d Cir. 1993) (noting that the opposition inquiry requires a factual determination that is entitled to deference on appeal). The decision makers regarding Tureaud's employment were Higgins, the Vice President who refused to process Harris's PAF and who recommended that Tureaud be discharged, and Warner, the President who approved Tureaud's discharge. During direct-examination, Tureaud testified that he spoke with several Grambling officials regarding Higgins's refusal to process Harris's PAF, including (1) Warner, the President; (2) Weaver, the Executive Assistant to the President; (3) Higgins, the Vice President for Student Affairs, and (4) Billy Owens, the Vice President of Finance.[3] Tureaud testified that during his conversation with Weaver, which occurred before he was discharged, she stated that "I should hire a black man and train him." The jury could reasonably infer that Warner had knowledge of Tureaud's conversation with Weaver, her executive assistant.[4] Furthermore, Tureaud persisted in submitting Harris's PAF to Higgins after it was initially rejected and met with Higgins to discuss Harris's application. The jury was entitled to credit Tureaud's testimony regarding his opposition to the unlawful

---

[3] During cross-examination, Grambling did not question Tureaud regarding his conversations with Warner or Owens. Thus, the jury heard uncontradicted testimony from Tureaud that he spoke with Warner, the ultimate decision maker, "[i]n [his] efforts to recruit assistance in having [Harris's] Personnel Application Form processed."

[4] Warner did not testify at trial. Weaver did testify, but she did not indicate whether she communicated the substance of her conversation with Tureaud to Warner. Considering her position as Executive Assistant to the President, it was reasonable for the jury to infer that she did.

employment practice.[5]  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

### 3.      Failure to Follow Proper Procedures

Grambling argues that "the undisputed facts show that Tureaud failed to properly follow the hiring procedures for Harris."  Tureaud testified that he followed the hiring procedures as explained to him and attempted to correct the procedural error that Higgins identified.[6]  Based on the evidence introduced at trial, a reasonable jury could find that Higgins treated the three black job applicants (Tureaud, Clement, Jones) differently from the one white job applicant (Harris) on account of race.  It was the jury's prerogative to disbelieve the various legitimate, non-discriminatory reasons proffered by Grambling, and the jury was entitled to infer discrimination based on its rejection of those reasons.  See Reeves, 530 U.S. at 147.

### B.   Compensatory Damages Award

Grambling asserts that the evidence presented at trial does not support the jury's compensatory damages award of $140,000. "We review with deference damage awards based on intangible harm, because the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." Giles v. Gen. Elec. Co., 245 F.3d 474, 487-88 (5th Cir. 2001) (internal quotations omitted). Nonetheless, to merit any award greater than nominal damages, emotional distress damages must "be supported by competent evidence concerning the

---

[5] Because we find that Tureaud's conversations with Grambling officials are sufficient to satisfy the opposition requirement of his retaliation claim, we express no opinion on whether his conversations with local community members would independently be sufficient.

[6] Tureaud testified that he had a meeting with Higgins before his discharge.  According to Tureaud, Higgins did not identify any other procedural errors with Harris's PAF and did not offer any assistance in getting Harris's application processed.

injury." Id. at 488. "In certain cases a plaintiff's testimony alone may be sufficient proof of mental damages." Id.

Tureaud testified that his discharge was "emotionally embarrassing" and "painful experience" that caused him to be "deeply hurt" because (1) he had never been discharged from a previous job; (2) he was part of a tight-knit law enforcement community and his discharge was the subject of gossip; (3) he was repeatedly questioned about the discharge by his peers and subsequent employers; and (4) he was unable to obtain suitable employment after his discharge. He further testified that he gained "quite a bit" of weight, was stressed, and "had the blues" because of the discharge.

Damages for emotional distress may be appropriate where "the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation." See id. Based on our survey of other cases from this circuit reviewing compensatory damages awards, and applying the "maximum recovery rule," we find that the jury's award of $140,000 in compensatory damages, while at the high end of the spectrum, is not clearly excessive.[7] See id. at 488-89; see also Williams v. Trader Publ'g Co., 218 F.3d 481, 486-87 (5th Cir. 2000); Forsyth v. City of Dallas, Tex., 91 F.3d 769, 774 (5th Cir. 1996).

C.     Attorney's Fees

Under Title VII, the district court "in its discretion, may allow the prevailing party, . . . a reasonable attorney's fee (including expert fees) as part of the costs . . . ." 42 U.S.C. § 2000e-5(k). In denying Tureaud's motion for attorney's fees, the district court stated that "the Plaintiff has been adequately compensated by the jury award of $222,500.00." We will disturb the award of

---

[7] Grambling also challenges the amount of lost wages found by the jury. Drawing all reasonable inferences in the light most favorable to the verdict, we find that there was a legally sufficient evidentiary basis for the jury to conclude that Tureaud suffered $187,000 in past lost income and $27,000 in future lost income. We note that the jury deducted $132,000 for Tureaud's failure to mitigate.

attorney's fees under Title VII only if the district court abused its discretion in making or calculating the award or based it on factual findings that are clearly erroneous. Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1581-82 (5th Cir. 1989).

The plain language of § 2000e-5(k) indicates that an award of attorney's fees to the prevailing party is discretionary. However, the Supreme Court has added an interpretive gloss to this statute: "a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances." Christianburg Garment Co. v. Equal Employment Opportunity Comm'n, 434 U.S. 412, 417 (1978) (emphasis in original). In this case, Tureaud was clearly the prevailing party, see Hensley v. Eckerhart, 461 U.S. 424, 433 (1983), and the district court did not identify any special circumstances justifying the denial of attorney's fees. In light of Tureaud's success at trial, we find that the district court abused its discretion by failing to award him reasonable attorney's fees. Cf. Farrar v. Hobby, 506 U.S. 103, 115 (1992) ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.") (internal citation omitted). The district court's conclusion that Tureaud had been adequately compensated by the jury award, without more, does not qualify as a special circumstance. See New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 68 (1980) ("[T]he court's discretion to deny a fee award to a prevailing plaintiff [in a Title VII case] is narrow."). Thus, we reverse the district court's order denying Tureaud's motion, and remand with instructions to award reasonable attorney's fees and costs to Tureaud.

## III. Conclusion

The judgment of the district court in favor of Tureaud is AFFIRMED. The order of the district court denying attorney's fees is REVERSED, and the case

is REMANDED with instructions to award reasonable attorney's fees and costs to Tureaud.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART